Argued at Pendleton May 7, reversed July 10, 1923, rehearing denied March 11, 1924.

## CONDON NATIONAL BANK v. CAMERON.

(216 Pac. 558.)

**Frauds, Statute of—Agreement to Repay Bank Money It Might Advance Held Performable Within a Year.**

1. An oral agreement by defendant to repay to a bank money it might pay to M. in aiding him to carry out his agreement with defendant to care for defendant's sheep for a term of three years could, as to the bank, have been performed within a year; the time of any demand or need by M. being indefinite.

Frauds, Statute of—Promise to Repay Money Advanced to Another Held Collateral Agreement.

2. An alleged agreement by the defendant to repay to plaintiff money. paid to M. to enable him to carry out his agreement with defendant to care for defendant's sheep, accompanied by defendant's refusal to sign a note with M. or give written guaranty, and the taking by plaintiff of a note from M., *held* to be a collateral promise to pay M.'s debt and not a promise to repay money as having been advanced to defendant.

From Gilliam: DALTON BIGGS, Judge.

In Banc.

This is an action to recover the sum of $3,070. The circumstances are as follows: The plaintiff alleges in its complaint:

"1.

"That during all the times and dates hereinafter mentioned and alleged the plaintiff was and is now a banking corporation, organized and existing under and by virtue of the banking laws of the United States of America, with its principal place of business at Condon, Gilliam County, Oregon.

"2.

"That in the month of March, 1919, the defendant was the owner of approximately fourteen hundred sheep, ewes; that on or about said time the said defendant entered into some kind of agreement with one W. T. Myers, wherein and whereby it was agreed that the said W. T. Myers tend, care for and range said sheep; that the said Myers was not financially able to finance the tending, caring for and ranging said sheep and required the assistance of some bank or individual to finance the tending, caring for, and ranging expense; that by the terms of their said agreement the said James M. Cameron was to receive, each season, a certain per cent of each wool clip grown upon said sheep, and the lambs of said band, and was also to receive a certain per cent of all the lambs born to said ewes, and the said Cameron, at all times, remained the owner of the original fourteen hundred sheep.

## "3.

"That on or about the month of March, 1919, at Condon, Oregon, the said James M. Cameron, for the purpose of securing such financial aid and assistance for said Myers in the tending, caring for and ranging said sheep, and for the purpose of securing the benefits and advantages which would accrue to him in the event such assistance was rendered to the said W. T. Myers, went to the plaintiff bank and there represented to said bank that said Myers was going to tend, care for and range his band of sheep under an agreement with him, and said James M. Cameron, by the terms of which said agreement each would receive of the wool grown on said sheep and their lambs, and each would receive each season, part of the lambs born to said ewes, and that the said James M. Cameron would handle all the money arising out of the sale of all the wool and all of the lambs born to said sheep, and that if the said bank would agree to furnish the money that the said W. T. Myers demanded of it, for the purpose of tending, caring for and ranging said sheep, during the term of their said contract—three years— and take his notes therefor and if possible not allow Myers to know that he, Cameron, had guaranteed and agreed to pay back to the bank all such loans so made, then he, the said Cameron, would see to it and promised and agreed that all of said loans were repaid to the said bank when the same became due. That the said plaintiff agreed to so do and acted upon said agreement so made between the plaintiff and the defendant aforesaid, and did from time to time in said three years' period pay over to said Myers, for expense purposes in tending, caring for and ranging said sheep, and took the notes of said W. T. Myers therefor as evidence of said debt, all as agreed upon between the plaintiff and defendant, and the said plaintiff refrained from advising the said Myers of the fact that the said Cameron had agreed to repay the amounts of money he secured from said plaintiff, until about the year 1922, at which time the defendant denied his liability; that

the plaintiff now holds, as evidence of said debt, a note so made by the said W. T. Myers for moneys furnished to said James M. Cameron, as aforesaid, in words and figures as follows, to wit:

" 'Condon, Oregon, November 19th, 1921.
" '$3070.00.

" 'Five months after date, without grace, for value received, I, we, or either of us promise to pay to the order of the Condon National Bank at the office of the Condon National Bank in Condon, Oregon, three thousand seventy and no/100 dollars with interest after date at the rate of 8 per cent per annum until paid. Interest to be paid annually, and if not so paid, the whole sum of both principal and interest to become immediately due and collectable, at the option of the holder of this note. Principal and interest payable in U. S. gold coin. And in case action is instituted to collect this note or any part thereof I promise to pay such additional sum of money as the court may adjudge reasonable as attorney's fees in said suit or action.

" 'I. R. stamps for $.62 attached and canceled.
" 'No. 7976.

" 'W. T. MYERS.

" 'Postoffice—Condon, Oregon.'

"That no part of money represented by said note has been paid and there is now due thereon the sum of $3070.00, with interest thereon at the rate of 8 per cent per annum from November 19th, 1921, until paid. That plaintiff has demanded payment of defendant and he has refused to pay the same or any part thereof.

"4.

"That the plaintiff furnished said money to the said W. T. Myers upon the sole credit and promise of said defendant that he would repay said sum to the plaintiff; and this plaintiff alleges that said money so furnished to said W. T. Myers at the request of said defendant as aforesaid, was for the purpose and sole object to subserve the interest said Cameron had in said band of sheep, the wool grown on them, and the lambs born to the ewes; that said money was not

furnished to said W. T. Myers, nor did the said Myers have any credit at said bank, and the said bank would not have loaned him said sum of money, or any other sum, upon his own financial responsibility, and the said bank took the note above described and had the said Myers sign the same all in accordance with its understanding and agreement with the said James M. Cameron, so to do, as an evidence of said debt, and did furnish said money upon the sole promise of the defendant aforesaid and not otherwise."

The defendant answered, denying the indebtedness and the promise, and substantially denied every affirmative allegation in the complaint except that he had leased to Myers the fourteen hundred ewes and was to receive a per cent of the wool clip and lambs born. He also pleaded the statute of frauds.

There was a jury trial and a verdict for plaintiff for the amount prayed for in the complaint. On the trial the defendant moved for a directed verdict on the ground that the plaintiff had failed to prove the allegations of the complaint. This motion was denied and the court's refusal to allow it is alleged as error here. REVERSED. REHEARING DENIED.

For appellant there was a brief over the names of *Mr. D. N. Mackay, Mr. John F. Reilly* and *Messrs. Raley, Raley & Steiwer,* with an oral argument by *Mr. Frederick Steiwer.*

For respondent there was a brief and oral argument by *Mr. T. A. Weinke.*

McBRIDE, C. J.—1. To take the objections in their inverse order, the first objection, that the contract was not to be performed within a year, is untenable because by its terms it could have been performed within a year, that is to say, the amount to be furnished Myers was indefinite and all that he demanded might have been demanded within the first year.

2. The other proposition, that it is a collateral contract on the part of the defendant, Cameron, is more serious. The complaint seems to be predicated upon the theory that there was an absolutely separate contract between Cameron and the bank, of which Myers was not to be informed; but there is an entire failure of proof as to any such secret agreement between Cameron and the cashier of the bank, a Mr. Crawford. Mr. Myers' testimony is as follows:

"A. The morning before the contract was signed Mr. Cameron asked me what bank I would rather do my business at. I told him at the Condon National Bank. He said he would go in there and make some arrangements, and we went in, and I had never met Mr. Crawford up to that time, and he gave me an introduction to Mr. Crawford, and we sat down there and talked. Mr. Cameron told Mr. Crawford he didn't want to sign no notes, but he would see that the bank got their money. * *

"A. That was about all; Mr. Cameron made the arrangements I could get the money to handle the sheep on in that way.

"Q. What did Mr. Cameron say there to the bank in order to get this money?

"A. Well, he told them he would see that they got their money back. * *

"A. He said he would sell the wool and the lambs and would handle the money. Yes; we could divide the money up and place mine where it should be; I was supposed to be in the mountains with the sheep."

Mr. Crawford's testimony is substantially as follows:

"A. Mr. Cameron came to the bank, I think a day or two before he made the contract with Mr. Myers and said he had talked with Mr. Myers about leasing his sheep to him, and that to do so Mr. Myers would need to have some assistance financially, and wanted to know if some arrangements could be made to that

effect.   They came in, I think, the next day, or within a day or two afterward, both of them together, and we talked the matter over.   Mr. Myers told me he had a few hundred dollars, but not enough to help him to take care of the sheep.   He said his daughter was attending school, I think in Portland or somewhere, and that what few hundred dollars he had he would have to keep for her use.   Mr. Cameron said he was willing to help him to get the money, and that he had asked Mr. Myers where he wanted to do his business. He said at the Condon National Bank.   I asked Mr. Cameron then if he would sign the note with Mr. Myers.   He said, No, he wouldn't do that, that he didn't sign a note with anybody for twelve or fifteen years or some such matter, and that he made up his mind he never would sign a note with anybody again. I asked him if he would agree to give a written guaranty of the payment.   He said, No, that was just the same thing as signing the note—he might as well sign the note as do that; but he said, 'I will be handling all the money that comes from the sale of the lambs and from the sale of the wool,' and he said, 'I will see that the bank is repaid whatever money it is necessary to advance Mr. Myers to care for the sheep.' That, as I remember it, is the gist of the conversation that took place, and on that conversation I agreed to advance him such money as might be necessary from time to time."

Then the following question was asked:

"Q. At the time this agreement was entered into did you agree to let this money out on the promise of Cameron?

"A. Entirely so.

"Q. Would you have let it out on the promise of Myers?

"A. No, because Mr. Myers had told me during that conversation all he had was two or three hundred dollars, three or four hundred dollars, which he needed for his daughter's education, and the homestead, as I remember it, and that is all he had; that

110 Or.—31

he wasn't financially able to undertake the running of the sheep without assistance.

"Q. Did Myers have any credit at the bank?

"A. No, I don't remember that I knew Mr. Myers at that time, that is, except to see him. Perhaps I did, but I don't think so.

"Q. State whether or not this money was loaned upon the credit of Mr. Cameron's promise.

"A. Yes, sir."

In substance, this is the only testimony as to the *corpus* of the transaction, all other matters merely tending to show whether this agreement actually took place, and the question is whether this is a promise to pay Myers' debt or a promise on Cameron's part to pay his own debt. It is not a question as to whether the plaintiff's cashier relied upon the alleged promise, but a question as to whether it was an original contract to pay money or a contract to be responsible for Myers' debt.

We have here this state of facts: Cameron goes to the bank and says to the cashier, "I will be handling all the money from the sale of the lambs and from the sale of the wool. I will see that the bank is repaid whatever money it is necessary to advance Mr. Myers for the care of the sheep." That is the promise. We have the bank saying, "Will you sign a note with him?" and the defendant replying, "No, I will not sign a note with him." "Will you sign a written guaranty?" "No, I will not sign a written guaranty, but I will be handling the money and I will see that you get your pay." This was not for money to be advanced to Cameron, but to be advanced to Myers. It seems quite clear to the writer that this was a mere collateral promise, the substance of it being, first, the opinion given by Cameron that Myers would not need a great deal of money, and that it was likely to be a

profitable contract, and that he would see the advances repaid and was in a condition to do so because he would have the handling of the money; but all the time it was Myers' debt and not Cameron's.  This was evidently the understanding of the bank at the time because they took Myers' notes for the amount and treated him as the original debtor, which he certainly must have been.

There is nothing in the contract itself, as detailed by Cameron, that goes to indicate that he intended to make himself originally liable for the debt or to be responsible in any way except to the extent of seeing that the funds of Myers that came into his hands would be properly applied on Myers' indebtedness.

This case furnishes a fair example of the evil that it was the intention of the statute of frauds to prevent. Here a bank loans money, takes the notes of the person to whom it is actually loaned, and then brings this action upon an alleged oral contract to compel an alleged surety or guarantor to repay that money in face of the fact that the alleged surety has absolutely refused to give a written guaranty to that effect or to become surety on the notes.  If this can be done the statute of frauds is ineffectual for any purpose.  The complaint is very ingeniously framed, but in itself, in the judgment of the writer, it does not state facts sufficient to constitute a cause of action and the testimony shows nothing more than an oral promise to pay the debt of Myers, to whom the money was to be advanced.

The judgment is reversed.

REVERSED.   REHEARING DENIED.